Case No. 25-5137, Norwich Pharmaceuticals, Inc., appellate v. Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services et al., Mr. Prince for the appellants, Mr. Schoenfeld for the federal appellees, Mr. Killian for the appellees' salaries, Pharmaceuticals, Inc., and Mr. Burgess for Appalachia Pharmaceuticals, USA, Inc. Good morning, Your Honors. Good to see you again. As we've been discussing, Norwich has spent more than five years trying to bring this generic to market, including by securing patent court judgments that none of the uses for which it is seeking approval in this other ANDA that everybody told us we should file are protected by valid patents. But FDA has refused to approve this one because of a so-called 180-day exclusivity held by a different generic manufacturer, Actavis, who settled its patent litigation, unlike us, and agreed to remain off the market for a decade. According to FDA, that forecloses the entire generic market in the meantime, even for unpatented uses of the drug. FDA misapplied the statute and should have concluded that Actavis forfeited its exclusivity on two different grounds. And the consequences of this, just so you know, are pretty severe. A 14-day course treatment of this drug for IBSD is $3,000. So if you agree with us in this case, we would respectfully request that you do so quickly and issue the mandate forthwith so we can fix this problem, which we're prepared to do right away. Unless the court has a different preference, I plan to start with actually the second issue in our brief, the failure to obtain tentative approval issue, because I think it's the most straightforward opinion you could write in our favor. Actavis forfeited the 180-day exclusivity by failing to obtain tentative approval within 30 months. There's a single exception to that bright-line forfeiture rule, which is that the failure is caused by a change in or review of the requirements for approval. FDA excused that forfeiture because in March 2017, it required sponsors to conduct comparative dissolution testing and was still reviewing the results of that as of the June 18 date. But that was error because they simply applied the wrong legal standard. The correct one is the default one, which is but for causation. And under that standard, nobody contends that we're wrong that there was a forfeiture. And for good reason, because as Bostock instructs, to determine if comparative dissolution testing is the but-for cause of the failure to obtain tentative approval, you just remove it from the factual world and see whether the same result would have occurred. And the answer here is obviously yes, because Actavis' application was deficient from the was filed and remained deficient for years after the deadline. The record clearly shows that there were two unrelated deficiencies that prevented approval, specifically serious quality deficiencies with the drug and a missing clinical endpoint study that FDA had required sponsors to conduct as early as 2012. And I believe that's undisputed. The information is under seal, so I don't want to go too much into it. Mr. Prince, I think I might be on board with the argument you're making. There's a part of it that gives me some pause, and that is the possibility that there is going to be an effect with no cause, because it seems like the deficient application was alone enough to doom success within 30 months. Yes. Even if the application had been perfect, it seems like the FDA's change in requirements was alone enough to doom approval within 30 months. That's at least kind of assumed for the sake of this argument. Is that right? Yes. So there are basically multiple sufficient causes. Right. And so you're saying, well, the change in requirements wasn't the cause because there's another sufficient cause. But, of course, the same thing could be said for the deficiencies in the application, that we could say they're not the cause because the change in requirements was sufficient to be a cause. So if the change in requirements are not a cause, it seems like the deficient application should not be a cause either for the same reasons. But now you're left with an effect, failure of the application that has no cause. Well, I have a few answers to that, Your Honor. First of all, the exception to but-for causation for multiple sufficient causes is not itself the federal default. I mean, that's the Supreme Court's debate in the Nassar case between the majority and the minority, and FDA's view that this is somehow a multiple sufficient cause case lost. But I'll just take it on its own terms, okay? They're applying the multiple sufficient cause requirement in the back. They're applying it upside down. They're applying it backwards. The context here is critical, and as Nassar explains, you need to understand the context to apply a multiple sufficient cause analysis. This is a forfeiture provision, right? It is a Congress added it to prevent the problem of first applicants filing deficient applications and then bottlenecking the approval of other applicants while they take years to actually do the work to actually get the approval process. FDA correctly recognizes at JA 580 that Congress's purpose was to prevent first applicants that do not meet the substantive requirements for approval from delaying other andes. So the general rule, which FDA describes elsewhere as a bright line rule, is harsh. You've got 30 months or you're done, and that applies, by the way, even if FDA is just being really slow. The cause we're talking about is a limited exception to that harsh rule because Congress did not want to penalize good-faith manufacturers who had good applications for situations outside their control. Under FDA's standard, a manufacturer with a blatantly deficient application gets a get-out-of-jail-free card just because by happenstance FDA changed a their application. If that's the standard, FDA needs to identify textual or contextual support for it, and there's absolutely no such support for that here. In fact, all the support cuts exactly the wrong way. Does it matter? I was just going to say that given the potential multiplicity of causes, wouldn't the presumption go the other way, that if they meant it to be but for a cause, you would expect them to have in Congress to have so said? I don't think so at all. I mean, Congress used the word caused by, which the Supreme Court in Barrage has specifically said is means but for causation. My friends say that Barrage interpreted results from, and that's true enough, but it specifically equated in the opinion itself results from to caused by. I mean, literally drew the comparison. And so the default presumption is but for causation unless they can show contextual or textual support that some other rule applies. Their other argument is that that's limited to the tort and criminal context, but that's also not true because this court, including in an opinion that you joined the panel on, Judge Pillard and Sinclair v. EPA, has applied it in the context of reviewing an agency's interpretation of its enabling statute. So the burden is on them to demonstrate the standard is different, and they've come nowhere close to showing that Congress would have intended some sort of get out of jail free card for deficient applicants. It doesn't really make any sense. I suspect, at least in the briefs, the main case the other side is citing is Kilburn, and I wonder if you would explain why the context there might be different. There's a lot of things I can say about Kilburn. So Kilburn was decided a decade before Barrage, so I'll note that. Where, again, in Barrage, the Supreme Court explained what the ordinary meaning of cause is. So this court didn't have the benefit of that. But that's also the context in that statute is, for example, one of the reasons why you would sometimes apply an exception to but jurisdictional statute, essentially trying to sweep within it terrorist-related activities. And the court declined to apply but for causation because it said it would be inconsistent with the structure of the statute in multiple ways, including that the statute substantively penalized material support for terrorism, which sort of indicates if all you need to do is provide material support to be liable, it indicates that Congress might not want a but for cause. But the other point it noted in that opinion was that because it's just a jurisdictional statute, it makes sense for it to sweep broadly because the underlying causes of action have their own causation requirements that could sweep more narrowly. So it makes sense to be more over-inclusive in that context. There's cases subsequent to Kilbrin, by the way, including Owens. First of all, what Kilbrin said is proximate causation was the standard there. But my friends are not applying proximate causation. They're not even applying that standard. They're applying a caused in part by standard, which appears, as far as I can tell, to be completely plucked out of thin air. It's not even a normal causation standard. The Department of Justice, in its brief, has attempted to reframe it, Judge Walker, kind of how you were thinking about it as a multiple sufficient cause sort of standard. They probably have a Chenery problem there, but whatever. I don't want to press that. But that argument doesn't work for the same reason I said before, which is they're applying it backwards. When multiple sufficient causes applies, it operates to punish sufficient wrongful conduct, even when there's innocent conduct or even perhaps multiple wrongful conducts. That's when you apply that, to impose, to prevent a wrongdoer from escaping liability. Here they're literally applying it upside down to excuse the wrongdoer, right? And that's the distinction. If there's no more question on that, I do want to make sure I can get to our failure to market claim. And this part of the statute is admittedly notoriously complex. But our basic point is simple, and that's that a first applicant forfeits its exclusivity by failing to timely come to market when another generic demonstrates that it's possible to obtain immediate approval for unpatent uses of the drug. The text structure and history of the statute foreclose FDA's position that 180-day exclusivity confers on a first applicant a right to exclude that is far broader than the brand holders' patents themselves allow, allowing here the first applicant to exclude all uses of the drug, even unpatented uses, for a decade. And again, this relates to the separate issue in that FDA is just ignoring the structure of the statute. To determine a generic's approval date, the statute applies a series of timing rules to each certification made by the generic and calculates a date associated with each and uses the last applicable date. Timing rule 4 is what causes the 180-day delay, and it applies only when a first and subsequent applicant have made a paragraph 4 certification to the same patent. We explained at length in our brief why that has to be right, and I'm happy to answer questions about it. So one of the reasons that maybe the FDA's view has to be right is that it seems like under your rule, because forfeiture, take as given for the moment that the statute does not allow a limited one-off forfeiture as to one subsequent applicant. The consequence of your position would be that if the first applicant, it might make sense as to your application, but the consequence would be forfeiture as to all subsequent applicants. And that's the reason why, when we ask what are the qualifying certifications, we have to look at the first applicant certifications. So we have not taken a position on whether the forfeiture would apply to everybody else, but I'll just assume it will, because, frankly, I think that probably is the better reading of the statute. I don't actually see why that's a problem for us, because what Congress is saying to the first applicant is when someone demonstrates that you can launch, you can't just sit on your hands, you need to launch. But wouldn't that mean if there was, the first applicant says, I want to use this drug for IBSD, not HE, and you come in and you say, I want to use it for HE, you would then have affected a forfeiture of their exclusivity period as to the IBSD use also. How does that make sense? Well, not in that case, because we would have been certifying to different patents. So we wouldn't even be applying the timing rule in the first place. But assume we did have a patent in common, right, which I think gets to your hypothetical. So we both had product patents, we certified to the HE, or we certified to IBSD and they certified to HE. I think we would be able to launch in that circumstance. And then everyone else can launch as to IBSD. Potentially, that could be correct. But that situation itself is going to be extremely rare, where the first applicant would have one product patent and one method of use patent. We would have a product patent and then an entirely different method of use patent. I'm not aware of any circumstance where that's ever occurred. If you believe us that the statute requires matching certifications, which again, FDA does not fight us on appeal, and they interpreted the language the same way which Congress reenacted, I think the rest of our argument just falls naturally into place. The statute, when it's determining whether there is a forfeiture event under BB, is asking what are the certifications qualifying the first applicant for the 180-day exclusivity period. They argue that it has to be the certifications qualifying the first applicant as the first applicant. But that's not at all what Congress said. It said qualifying the first applicant for the 180-day exclusivity period. And the only place that you can look in the statutes determines what qualifies you for the 180-day exclusivity period is the operational provision of Timing Rule 4 itself, again requiring matching certifications. FDA's view is just reading language out of the statute and wishing it away. I think we also win on very solid, our interpretation is also consistent with the purpose of the statute, right? I don't think anybody disputes that in 2003 Congress was trying to rein in the scope of exclusivity at that time when the statute operated, you know, in some sense how we're saying it operates now, which is it matching certifications. But the problem at that time was that Congress, FDA had interpreted the statute so there are multiple sequential periods of 180-day exclusivity. Congress fixed that, but it fixed it by defining the term first applicant and making one single period of exclusivity tied to when they mark it. It didn't change anything about this patent by patent blocks more broadly than the timing rule itself, which doesn't really make any sense. And in fact, the scope of that exclusivity is way, way, way broader than it was prior to 2003, such that it's blocking unpatented uses of the drug. It makes no sense that Congress would have intended that. Isn't that comparing apples and oranges? I'm not going to be able to aptly describe why, but the one is sequential, multiple sequential, and the other is to the extent there's 180-day period, what's its scope? And that seems like those aren't necessarily inconsistent. If the prolongation shouldn't be available with respect to different indications of one drug, well, go ahead. I agree. And that's the fundamental point. And this is where, if you're asking me what went wrong here, I mean, again, FDA agrees that under the 2003 version of the statute, as far as I can tell, we would prevail because it only blocks matching certifications. And what had happened at that time is FDA called its general approach to the statute, including matching certifications, including that there can be different periods of exclusivity. It called all that patent-based exclusivity. And Congress, people complained about it. There were court decisions about it. And Congress changed it and said, we're no longer going to have patent-based exclusivity. We're instead going to have product-based exclusivity. This isn't in the statute. This is all informal industry lingo. And I think FDA said, oh, no more patent-based exclusivity. That means the whole part of the statute requiring matching certifications no matters. But that's not what Congress was doing. Congress was shutting down the sequential periods of exclusivity. But if it's patent-based, then doesn't that or if it's relational, then don't you have different 180-day period? They can't extend past 180 days, but you have different exclusivities with respect to different... There's a single period of exclusivity because that period is measured from the first 180 days of marking. But this goes to the question you were asking before, which it goes to the scope, right? Because the exclusivities are still tied to specific patents, but they all start and stop at the same time. It's one period. So it's an issue of the scope of that exclusivity. Why are you emphasizing this relational idea then? Because that's how you know what the qualifying certifications are, right? The idea that there's a first applicant, there's an exclusivity in the abstract is not how the statute's structured, right? It's structured effectively as a computer algorithm. I mean, there's sort of an evil genius way to it about this. And it's running the 180-day exclusivity provision on each certification made in our application, right? It's going to run it many, many times on an application. Why isn't it running? I thought it was just running it on the drug. No. So we have an application, right? The statute instructs FDA to look at each certification made in that application and apply a series of timing rules to it. The 180-day exclusivity is timing rule four. And so it's going to apply that provision multiple times. It's going to apply it to every paragraph four certification we have made in our application to see if it's blocked, right? Everything is nested under a colon where the statute is specifically instructing FDA to apply it to each certification. FDA never responds to that. They just simply ignore it or act like Congress did it by accident. But Congress did it that way in 2003 when it amended this provision. So that's when it all happened. I hope I can persuade you if you look at the statute that that's how it works. This is where you have that chart in your brief. Yes. Right. The statute literally says you apply the following rules to each certification made. All of our certifications. And that's why you know what the qualifying certifications are. Thank you. Thank you. Thank you. Good morning and may it please the court. Gabriel Schoenfeld for the government. FDA applied the correct legal standards to determine that activists, a first applicant that qualified as eligible for exclusivity by submitting an ANDA for Rifaximin four years faster than Norwich did, had not forfeited that eligibility and that Norwich's subsequent application could not be approved as a result. It's worth emphasizing at the outset, your honors, what isn't in dispute today. There's no dispute that activists is a first applicant and there's no dispute that so long as it remains eligible for exclusivity, that that eligibility would operate to block Norwich from approval by the effectiveness of application provision that you were just discussing with my colleague a moment ago. And I think it's worth starting where my colleague ended with the failure to market forfeiture provision, your honors, because I recognize this is a complicated and articulated scheme and I think I want to catch you. Please, Judge Pollard. Let me just ask you a threshold question. Has activists amended its ANDA to include paragraph four certifications to the new IBSD indication patents that Salix acquired that are the subject of the New Jersey case 912 and 571? My understanding, your honors, is that the 370 ANDA does contain paragraph four certifications of those patents, which is why Salix has been able to bring that litigation in New Jersey over them. And is that not relevant to the forfeiture analysis even under Norwich's theory? In other words, if an activist shares paragraph four certifications to the same patents as Norwich's 370 ANDA and they haven't experienced a forfeiture event because they're being actively litigated, is that an additional reason that a failure to market forfeiture has not occurred? It's not, your honor, because the patents that qualify an applicant for exclusivity, that qualify it as a first applicant, are only the ones that it's certified to on day one because these are later issued patents. They don't matter, but I think that this does get into an important distinction that Norwich's position is really built on a lighting, which is the distinction between whether a first applicant is eligible for exclusivity, whether it has qualified for the single 180-day exclusivity period that is applicable as to all subsequent applicants, and whether that period, in fact, operates to block a subsequent applicant based on the specific contents of its subsequent ANDA. So the provision that you were just discussing with Mr. Prince about whether it contains such an application, it's true that that provision is applied on a certification-by-certification basis as to each subsequent applicant. The problem is that's not the provision of subparagraph B4 that says when a first applicant has qualified for exclusivity, and that's what forfeiture turns on. Forfeiture doesn't turn on the contents of a subsequent applicant's ANDA, which might affect the scope of the exclusivity's blocking effect, you might say. A reveal its scope? Does it affect its scope or does it just reveal it? I think the fairest way to read the statute, your honor, is that it is a matter of revealing the scope, or it is a matter of the scope of the eligibility's blocking effect as to a specific ANDA, rather than whether the eligibility exists as a threshold matter. Remember, your honor, that the relevant statutory language talks about the patents that are qualifying for the 180-day exclusivity period, and the 180-day exclusivity period is a defined term in the statute. You can find it on page 12 of the addendum to the government's brief. This is it, Roman 2 under subparagraph 4. The 180-day exclusivity period is defined in generic terms. It's not defined in terms that vary based on the contents of a subsequent applicant's ANDA. It's the 180-day period, the ending on the day before the date on which an application submitted by an applicant other than a first applicant could become effective. So, the qualification, rather, the existence of 180-day exclusivity period doesn't depend on the existence of a subsequent ANDA. The period exists whether a subsequent ANDA asks FDA to consider whether that period is blocking or not. And that definition of the 180-day exclusivity period only contains one qualification, one precedent requirement that has to be satisfied in order for that period to come to existence, and that's being a first applicant. The qualifications for being a first applicant, I think nobody disputes here, are then set out in subsection BB, also under Roman 2 of subparagraph B4, and it explains that it's submitting a substantially complete ANDA that contains paragraph 4 certifications on the first day. You agree, if there was no matching certification at all between the first applicant and Norwich, they just wouldn't be blocked. That's the FDA's position. Okay. But the reason that's not an issue here and the reason that FDA didn't reach the question of whether such a certification post-2003 requires matching certifications is because everybody agrees there are four matching certifications that's one to the IBSD patent, I believe. So, maybe more accurately, the FDA hasn't taken a position on that question. That's correct. Because this case doesn't present it. Exactly. And that's why we believe that this court should likewise not reach the question of whether such a certification requires matching certifications. And if the court doesn't have any additional questions on the... Yes, Judge Peller. Thanks, Your Sense. I'm sorry. If the court doesn't have any additional questions on failure to market, I'm happy to address failure to obtain tentative approval as well. Yeah, go ahead. So, first, I want to emphasize at the outset, Your Honors, that FDA does not concede that there would be a forfeiture under the but-for cause standard that Norwich proposes or under any other causal standard this court might see fit to instruct FDA to use. The standard remedy for when an administrative agency applies the wrong legal standard would apply here, just like in any other case. The court would inform the agency the way in which the standard applied was wrong. It would remand for reconsideration of this, I think, complicated factual question if it's a but-for standard under the appropriate standard. But more importantly, Your Honor, FDA... And why is... Why would there be a need for a remand? And maybe I can ask it this way. You're not... If there had never been a change in the FDA requirements or rules post-application, according to you, we don't know whether activists' deficient application would have been corrected and then approved before the 30-month deadline. That's exactly right, Your Honor. I think this gets to a real problem with the but-for cause standard that Norwich is urging this court to adopt, which is that it would require the agency to construct a completely impenetrable, hypothetical, counterfactual world of, if FDA had not asked the applicant to invest additional resources in addressing this change requirement, how would that have played out both before and, frankly, after the 30-month date? Because, for example, what if there was an inspection that in the real world happened after the 30-month date? That may be a downside of their tests. If we're going to, like, talk about downsides, it seems like a downside to your test is that it gives activists a get-out-of-jail-free card for forever. I don't think that's the right way to frame it, Your Honor. I think the way to understand it is that if there's one thing that Congress was clear on when it wrote this particular exception to the forfeiture provision is that it wanted to ensure that applicants which were unable to obtain tentative approval as of the 30-month date through no fault of their own, or at least through no fault of their own under a specific set of circumstances where it was FDA that moved the regulatory goalpost, so to speak, wouldn't forfeit exclusivity as a result. But under your theory, activists makes an on January 1st, 2000. And then on January 2nd, the FDA changes some requirements. Now it's January 1st, 2050. They still haven't gotten approval. That's excused because the FDA made a change on the second day? Certainly not automatically, Your Honor. The question would be as of the 30-month date, first, was the applicant still working on the deficiency that FDA had? Was the applicant still working? Excuse me. So imagine they were barreling towards a forfeiture and the day before the 30- month mark, they're just sitting there, oh, gosh, we're about to forfeit. And the day before, out of nowhere, FDA changes requirement X that no one was even thinking about. That's the get out of jail concern with your rule. I would push back on the characterization of it. That is how the rule as FDA currently applies it would operate. I'd push back on the characterization of that as a get out of jail free card, Your Honor. It's a matter of- It is entirely a windfall from the perspective of the first applicant who had a fatal deficiency, let's just assume because this is the rule you're advancing, on requirement A. And they are going to be denied. They're not going to be approved by the 30 months. And from their perspective, it is entirely fortuitous. And they are let off the hook because of something that doesn't change the fact that they never would have been approved anyway. It does seem, as Mr. Prince put it, completely backwards. I think the way to understand this, Your Honor, is a little bit through the lens of a question that Judge Walker asked my colleague earlier, and understanding which way Congress intended to answer a particular question. So as Judge Walker noted, the classic reason, or this is a classic example of multiple sufficient causes for one thing. And the reason we generally don't apply but-for cause in those situations is because you end up with a situation where effectively all of the causes are excused from having a particular effect. And here, Your Honor, if I can finish for a moment, the one cause that Congress identified as the cause it wanted to make sure wasn't excused for the effect it would have on preventing the application from being approved was FDA changing requirements. Well, I do think this is the whole question as to statutory context. It's essentially, who's the wrongdoer? What is the wrong thing? And is this provision, is the dominant thing it's saying that a bad product that can't get approval by 30 months, that that product should not hold up the rest of the market? It seems like a pretty strong argument that's what they had in mind. Or were they more concerned with the possibility that someone with a bad product, but now they've also got to do some extra work for the FDA, that they want to make sure that person is off the hook for liability? And it is if you think of this the other way, I think it's quite clear that Congress would want the independent failure of activists to get approval being a sufficient cause to be enough to warrant the consequence of forfeiture. If you look at it from that perspective, it's hard for me to see why in this, the hypothetical activists, I know this isn't the facts, why they are the ones this provision is sympathetic to, as opposed to everyone they're holding up. It's telling, I think, Your Honor, that Congress didn't more generally carve out situations where the agency could in some way be thought of as the wrongdoer at fault. Maybe it simply took a long time. Somebody was out on vacation at an opportune moment. But Congress carved out a specific circumstance where an action by the agency through no fault of the applicants would cause the applicant to not obtain approval by a certain date. And Congress specifically called out that instance as when it wanted to excuse forfeiture. And FDA, since it began applying this provision, this is its contemporaneous and continuous interpretation, has always treated that as erring on the side of treating, to borrow your phrase, treating FDA as the wrongdoer whose act don't want to excuse the consequences. If you were Congress and you had to disincentivize one of two possibilities, the first possibility is deficiencies in an application. And the second possibility is FDA improving the requirements in their application process. Seems like you would want to disincentivize the first of them because a deficiency in application is all cost, no benefit. On the other hand, the second of those, FDA improving their requirements, has some benefit, the improvement, although admittedly it comes with the cost of delaying the application. Wouldn't Congress have wanted to disincentivize the thing that's all cost and no benefit rather than the thing that's part cost, part benefit? I'm not entirely sure I'm following your question. If Congress had to choose between something that's all bad or something that's kind of bad and kind of good, wouldn't Congress have preferred the thing that's kind of bad and kind of good? And in your view, I'm sorry that I think I lost the thread. FDA improving the requirements of an application, that's kind of good and kind of bad. Activists submitting, having a deficiency in its application, that deficiency is all bad, no good. So Congress would prefer to, if it's going to disincentivize one of those, it would want to disincentivize the deficiency in the application, the thing that's all bad, and not FDA improving the requirements of an application process, which is partly bad, partly good. Therefore, recognizing that in causal terms, that you don't get the, you forfeit if your application is deficient, even if the FDA changed its tune midway. Yes. Thank you. Especially in the Hatch-Waxman context, Your Honor, where Congress is striking complicated balances in a policy area where I think a lot of reasonable minds could disagree about what the right path forward is, I think it's really important to resist the urge to reason backwards into the legal rule from what our intuition might be about a particular case. And here, Congress wrote a statute that uses a term caused by, that this court has not previously held, has previously said it doesn't, require but for cause of its own force. And the strongest contextual signal that the court has in front of it is FDA's unbroken contemporaneous interpretation of erring on the side of ensuring that the specific FDA action that Congress called out doesn't pause a forfeiture that then the first applicant cannot get back. So if we assume the case turns on contextual indications as to whether Congress wanted this rule to be but for or sufficient cause, it seems like so far in favor of sufficient cause, you've highlighted administrability concerns, which may be meaningful, and second, that this is the FDA's longstanding interpretation. Is there another contextual reason that you think favors? Those might be sufficient. I just want to make sure I have all the arguments. The third contextual reason I think this is the weakest of the three, candidly, is just the fact that Congress did call out this one specific type of agency action that would any time, you know, you can point to the agency and say... But do you appreciate that that setup does follow sort of the plain text structure of this provision, which is the default is forfeiture, and what you would expect to come after the unless is you might expect it to be a narrow exception, not a broad one, and a narrower exception would be served by requiring that to be a but for cause. I think it's narrow in the scope, as compared to the scope of all of the ways that FDA's actions could, through no fault of an applicant's, prevent approval by a giver. Which is another way of saying this generally is a very harsh forfeiture provision. Yes, I think generally it's quite a harsh forfeiture provision, but I think that the... Generally, it's quite a harsh forfeiture provision, but in some ways, Your Honor, we're not necessarily interpreting the full breadth of the harsh forfeiture provision. We're interpreting the specific point where Congress intended to be the forfeiture provision be less harsh. We're interpreting the scope of the excuse provision, where Congress called out a specific instance, and this is in addition to the other two contextual reasons you identified, which frankly, I think are stronger ones. I'll try one last time to just... So, take as given, Congress thought it was a good excuse if you are delayed because FDA changed a requirement. What we're talking about is should that person be off the hook, where the good excuse made no difference? Would Congress want that person off the hook, where the good excuse or not, they were going to forfeit? This is why, Your Honor, I think the point that we were just discussing is the weakest of the three contextual reasons that we've discussed. There'd be massive administrability problems in terms of an agency trying to construct that but-for world, which largely, frankly, turns on information that an agency doesn't have access to about the amount of slack resources an applicant had, how clever that applicant's management might have been in reallocating resources and applicants' general sophistication. And second, the unbroken contemporaneous FDA interpretation, which even in a post-slope or bright world is a powerful indication where the text is admittedly not fully determinate in a vacuum, is a powerful indication of what Congress would have meant. Can you talk about this longstanding interpretation? Is there a regulation you can point to? How do we know? When did FDA adopt that and what memorializes it? So, I'm informed by my clients that this has been FDA's approach since the MMA was adopted in 2003. Because the MMA grandfathers in free 2003 applications, it didn't actually begin applying the approach until it got applications to which the new law applied sometime later. But there's a public advisory that sets out the agency's interpretation of the statute. I don't-there's certainly-there's a district of-there's a district court decision from the District of District of Columbia, I believe 2003, called Mylan, which is cited in Teva's briefing, in which a district judge in the circuit upheld FDA's approach. It doesn't really-it doesn't involve a challenge to that standard and it doesn't analyze the statute, though. It does-for purposes of-it reflects that it exists, I see. Yes, Your Honor, that's exactly my point. If the court has no further questions, we'd ask that you affirm the judgment below. Hello again, Mr. Killian. Hello again, Your Honor. I'd just like to make a few quick points about the failure to market forfeiture. So, Norwich frames the failure to market forfeiture as a dispute over which patents need to have forfeiture events. Is it those that activists peep forward or is it those that Norwich peep forward in its application? Our position is that it's a red herring, that question, because either way the statute's interpreted, there have not been sufficient of forfeiture events. If you go with what we think is the correct interpretation of the statute, then Norwich certifications shouldn't matter because the forfeiture provision for failure to market forfeiture refers to the first applicant's qualifying certifications. And a qualifying certification, in the ordinary meaning of qualifying, is it makes someone eligible or meets the criteria to obtain something. And so, the qualifying certifications, naturally read, would be the certifications that the first applicant submits on day one. And that's an important distinction because I think, as one of your honors noted, it is possible that subsequent to the initial filing, the brand will post or put new patents into the orange book and the first applicant may submit P4s for those subsequent patents. And so, there may very well be, at the date of approval, a bundle of first-day P4s and a bundle of subsequent P4s. And it's the first-day P4s that qualify the first applicant for the 180-day exclusivity. That's the reference that we think the statute means. And so, it's not a reference to activists' certifications. In no way does it make sense that activists' certifications would qualify. I'm sorry, I misspoke. I'm going to unwind that. In no sense, it doesn't make sense for Norwich's certifications because Norwich's certifications can't qualify activists for the exclusivity. Now, Judge Garcia, you asked a question about earlier whether if two applications, the first and a subsequent, don't have any matching P4s, would we still be in this situation? And I think the answer is possibly if they both have P4s because that's how the coverage provision, eligibility provision, J5B4, is written. If the first applicant has such a certification, which is a reference to P4, and the subsequent applicant has a P4. I understand that plain text argument. Why would that be a rule that makes sense? In that you would allow a prior, and I understand it's also not this case, but you would allow the first applicant the benefits of a broader sort of blocking force without taking on the burden of certifying to those patents. Sure. But I think, Your Honor, the point is that the first applicant is strongly incentivized to bring as many P4s as possible. So, I don't know that this scenario could come up all that often. But be that as it may, it would make sense that the first applicant who put itself out there brought all the patent infringement litigation and got itself to the point, as this Court has said, of, you know, it's a pro-consumer device, this 180-day exclusivity. It is a reward in an extent. Now, I'd just like to turn briefly to the second point that I made, which is that even if Norwich's interpretation is correct and we look at Norwich's certifications only, there still have not been forfeiture events for the polymorph patents. And that's because while a second applicant needs to have two things in order to do that. It needs to have a tentative approval of its ANDA, and it needs to have a finding that that ANDA doesn't infringe. And here, the problem is Norwich hasn't gotten both of those things for the polymorph patents. And this gets back to the stipulation that we talked about earlier and which we raised again in our brief here. What has been tentatively approved was the amended 369 ANDA. But the amended 369 ANDA is not covered by the stipulated judgment because the stipulated judgment says it only applies to the ANDA if it's never amended. And so the congruence of having both a tentative approval and a judgment that that ANDA doesn't infringe is missing even on Norwich's interpretation. And does anything hinge on the tentative approval part of that? Yeah, in the sense that they have a tentative approval, but it is for the amended ANDA, which the terms of the stipulated judgment do not cover. The stipulated judgment says this applies. So your argument is just the final judgment of non-infringement isn't binding here because of the amendment and the limitation on the stipulation? Yeah, I wouldn't say it isn't binding. I would say it isn't applicable because by the way it is written, it applies to something else. So either way, Your Honor, I think our point is simply that the runway isn't clear under the failure to market provision. Salix's patents, the HE patent, which is certified in activists' ANDA, and even the IBSD and polymorph patents, which even on Norwich's view we think don't have sufficient forfeiture events, they remain obstacles to marketing. And so there hasn't been a failure to market. Thank you. Morning, Your Honor. Brian Burgess for Teva Pharmaceuticals. I'm going to jump right into the tentative approval and causation issue, but I'm happy to entertain the Court's questions on any topic. We don't think but-for is the right standard, and I also want to be clear that we don't think that there were independent deficiencies that would have blocked the approval of our application, or at least that that's not established in this record or decided by it. I don't want to get too drawn into the particulars of that, but I do think that those things work together because it shows in practice how difficult it is to disentangle the issues. One thing that was identified by Norwich's counsel was an inspection issue. There wasn't an inspection on the 30-month deadline. That happened well after. We don't know what the inspection would have been on the 30-month stay, and in fact, in the earlier notice to activists at a time where the agency was noting its new qualifications, there was no inspection issue identified there. So it becomes speculative and counterfactual. We also think the issue with the clinical studies, that's not separate from the change that occurred. FDA adopted broad new standards with respect to bioequivalence in 2017 that were certainly involved in dissolution studies but weren't limited to that, included a whole new option one, option two framework for when things were going to be required. All this goes to if we think the FDA got but-for causation wrong, we should vacate and remand for them to consider all these things, right? I think it certainly confirms that, but I think it also shows why but-for is not an administrable standard in this context, and it's not what you would have expected Congress to have here. The question of when an inspection would have occurred and whether issues would have come up, it's just unknowable, and it's asking the agency to engage in speculation. Here there was an inspection, but in many instances, the agency won't even have engaged in an inspection that finds there was a sufficient reason to preclude approval of the ANDA based on another reason, which could solely be based on its change. So if it's not but-for causation, is there any quantum of causation that is required under your interpretation? I think it's sufficient cause, which I do think is the interpretation that the agency has announced. Doesn't that raise puzzling counterfactual questions? I mean, there could be puzzling counterfactual questions in either direction. To add, Judge Garcia, you're asking for contextual clues about why one versus the other here. We certainly agree with the ones the government put forward. Another one that I think is important is on there, you could have multiple changes, for example, by the agency. It changes a requirement as to bioequivalence, and it changes it as to product manufacturing. Imagine that those two changes are independently sufficient to block the approval. They could be the only changes. Otherwise, the applicant would have been on a glide path to approval. I think on their view, there would be a forfeiture here because you do have the two sufficient causes, and I think that's a real problem. Even in the hypothetical example where the windfall question you were asking, Judge Garcia, I think the problem is it's very difficult to know that in the abstract, whether there is going to be a deficiency. And so the question is whether Congress would have expected FDA to undertake that kind of inquiry here. Are administrability reasons really going to be what decides this? I mean, just even deciding the record here shows, defining it was a sufficient cause is sometimes difficult. You have to show that you were diligently addressing the requirement. You can't sit on it. It's going to involve factual questions either way. It certainly will involve factual questions either way. The agency, and to answer a question earlier, the agency has set this out in guidance, how it applies the standard in 2017. You can also see it in the Joint Appendix, I think 168. They look at questions about... Is that guidance cited, the 2017 guidance we just mentioned, is that cited? Do we have... Yeah, no, it's in the record. We've cited it. 168? I'm sorry? You can see it at Joint Appendix 168. It spans a few different pages, but this has been the agency's long-settled interpretation. The agency has been, as to the question of what's administrable or not, the agency has been doing this for over a decade and has found that this standard is workable, and it's going to consider questions about whether the applicant was acting with diligence, what kind of change it was. Those can be factual inquiries, but... I see a version of the question that I think Judge Walker and I were both asking, which is essentially that I read every single case and every restatement and treatise to say, you shift from but-for to sufficient cause when it's necessary to do so that a wrongdoer doesn't get off the hook. So Kilburn, Burridge, Barrage, every other case. And so it seems to me if that's the way to think about this case, then it matters whether I think from the statute's perspective, the person who was... The applicant that was going to not receive approval, if the FDA hadn't changed anything, is the wrongdoer. And it's really hard for me to see a contextual purpose, common sense argument that from the perspective of this harsh forfeiture provision, that's not the wrongdoer. I'm not assigning blame. No, sure. I hope you understand the question. Yeah. I mean, I think it's difficult to transpose the wrongdoer concept that applies in tort where you're going to have an adjudication of cause, which is not applicable in this administrative context. Same thing in Kilburn, right? We're not going to say every state sponsor of terrorism is immune because there was more than one involved. That's no necessary cause. And that's not necessarily in a tort context. No. Well, right. But the court didn't apply but-for there and nor did they consider it to be the default standard. It looked as to whether there were contextual indications that nonetheless it shouldn't apply but-for. Whereas I think where the default is in the adjudicative context where you're going to have to have a fact finder make these decisions based on discovery. These questions about when FDA counterfactually might have approved a product, it litigated another context, like in antitrust cases, about whether there was a delay in generic approval. In addition to the reasons that Judge Garcia was giving, there's a reason that we haven't talked about yet, late as it is. And that matters to me. You can tell me why it shouldn't. If an applicant has a deficiency in their initial application and then later the FDA changes the requirements for an application, the sequence of those things seems to cut against you. And here's an analogy that I'm thinking of. It's the second and I promised the last sports analogy for me for the day. But imagine we're trying to figure out the cause of a missed field goal in football. And as soon as the kicker kicks the ball, it's clearly going in the wrong direction. There's no way it's going to go through the field goals. That to me is analogous to a deficient application submitted on day one. Imagine if while the ball is in the air, someone moves the field goal back a bit so that the distance is longer than the kicker kicked. I don't think any of us would think that it was the moving of the field goal back that caused the kick to be missed when the kick was already going to be missed because it was in the wrong direction. I think the problem with that is that the approval process isn't a one-time event. It's over a 30-month period where the applicant and the typical case that an application is fully approvable as submitted. That's just not how it works in this industry. There's often a back and forth. And so the question is, outside of the whole framework being changed because the agency has adopted new requirements during the course of the approval process, would the applicant have been able to meet the 30-month deadline? Not was it pristine on day one when it filed it, but whether it was going to be able to with the agency to get it? And I just think it's unknowable when you have the agency changing the framework in a way that has cascading effects throughout the approval process because these things aren't happening separately. It's not just so you check one box and then move on. Everything interacts with each other. I think related to that, but also related to what our remedy would be here if we disagree with you on but-for causation, I think I may have erred in how I read the briefs coming into this argument because I thought there was an understanding from the briefs, kind of a unanimous agreement that activists would have failed to meet the 30-month deadline independent of the FDA rule change. No, I don't agree with that. I think if you look at, for example, page 363 of the joint appendix, the agency when it's engaged with this question is because under our test, it was a sufficient reason that made it impossible for activists to secure approval by the 30-month deadline. Under our test, our analysis stops, so it didn't consider whether there were additional potential changes that were implicated in activists' inability to get it. That page is not a page of the brief. I'm not saying that what you said isn't a winning argument on that point, but if Mr. Prince gets back up here on rebuttal and he can point to a page in the FDA brief and the Teva brief and the Salix brief that all concede that activists would have failed to meet the 30-month deadline independent of the FDA rule change, you know, you're not going to have a chance to get back. I understand. Your brief, would you point to disprove that? It's kind of an unfair question because you don't know what he's going to say. Yeah, I mean, this, of course, was the backup argument that they were making in their brief, and we devoted a corresponding amount of space to it. I don't think we ever conceded that we would lose under but-for. We just said it didn't matter, that the right way to approach this question is that a sufficient condition satisfies, caused by, under the ordinary meaning of that term. And to respond, I think, to the concerns about, I guess, a windfall or that it's a get-out-of-jail-free card and you're never going to have an issue, the provision doesn't operate in isolation. There are other basis for forfeiture that can come into play here. For example, the applicant has to diligently pursue its application. That argument was made to the agency. It decided it at 384 of the joint appendix. Norwich initially raised it in litigation and then dropped it when it saw the administrative record and thought that there was, evidently thought there was adequate support for the agency's determination on that. There's also, of course, the failure-to-market provision. I think an important context to keep in mind is the question of whether activists has tentative approval is not actually affecting whether activists can get into the market at the moment because there's independently a patent barrier on the application that we filed. We were the first applicant. We engaged in litigation and were able to secure a settlement that lets us enter the market almost two years before the expiry of the last patent. Norwich, if it had succeeded in the challenge to that patent, could have forced a forfeiture under failure-to-market. It didn't. It's still currently embroiled in litigation about whether its ANDA is going to be able to be approved or whether it infringes the patent, whereas activists has taken on the burden and is able to get onto the market earlier. To the extent we're unable to do that or there's another ground for forfeiture, then Norwich would have a free pass, but we don't think that's true here. I also think it's important to note that the question of what happens after the 30-month date and is there ever an end point to this is not something that is really solved by the but-for versus the sufficient cause issue. You could have a but-for cause that takes an applicant years to address. You could have something that was the but-for cause at the 30-month date and then something new arises because the agency has changed its standards again or there was an inspection issue that wouldn't have existed previously. This is a dynamic process. I thought it was a problem that is caused by interpreting the caused by a text the way that you interpret it. Say that again. I'm sorry, your honor. I understood the problem to be that if we take your interpretation of the text caused by it, then it creates the problem that the process may play out for years and years and years and years with no negative consequence to the applicants who is causing it to play out much, much longer than it would have with or without the FDA requirements changing. I did a 50-year hypothetical earlier, but even this case, we don't have to do a huge hypothetical. This case, I think your application was filed in what year? 2015? That's right. Here we are nine years later and I don't know how much longer. As I said, that fact has no real-world implication about whether we are able to commercialize the product because we are barred by the patent. There are other reasons that there could be a forfeiture. If there truly was a clear path on the patents to which we had certified, then failure to market would come in. If we don't get on the market within 75 days, then we forfeit in that instance. We're eight years past the FDA rule change, right? Right, but I think there's no way you can read a tolling rule into the statute. We're just trying to figure out what Congress intended by caused by. You think they intended? I guess the point I was making is that the get at it because you could have a change that is undisputedly a but-for cause at the 30-month date that then takes the applicant many years to address. This is just an on-off switch. The more common thing that would happen is that they change requirement B and you've got a huge problem on requirement A and 30 months comes and goes. This basis for forfeiture evaporates and we're here six years later while you're trying to meet requirement A. I guess my point is that it evaporates regardless. It is an on-off switch at that time and reasonable minds can disagree about how, as we noted in the final page of our brief, there have been legislative proposals to have an option for subsequent applicants to potentially get on the market just based on the passage of time rather than having an exception for changes in requirements. The agency, I believe, has supported that. The Trade Association for Generics has strongly opposed it. I think that would have a pretty good idea of what on the whole is good for the industry rather than individual applicants because they think it would dilute the 180-day exclusivity incentive. I guess maybe I'll close with that. Judge Walker, you asked the question about there's on one side we have this negative consequence, on the other side there's nothing on the balance. I just don't think that's correct because it suggests that the 180-day exclusivity is something Congress wanted to limit and that it's pernicious and should be narrowed as much as it can be. I don't think that's consistent with the court's opinion. They wanted to use it to incentivize non-deficient applicants to submit non-deficient applications. They did, but for the 180-day exclusivity to work, it needs to be predictable and certain. When you have a complicated causal question that it's going to be very difficult to know how the agency might come out on a but-for scenario, it will have the effect of diluting the value of that adopted as the tool to promote generic entry earlier overall in the aggregate. Thank you. Thank you. I think we get to hear one more time from Mr. Prince. Just a few points. Thank you, Your Honor. We totally acknowledge that there could be difficult cases in teasing out causation. I think those concerns are overstated. Remember, FDA is always going to be looking at this backwards. It's going to know whether it would have approved the application or not. It does a similar but-for causation analysis, for example, when it's applying 355Q of the statute, which is the other provision that's asking if there's been a delay due to a citizen petition. It's already familiar with doing but-cause. Whatever difficulty there could be in some other case, this is not it. Judge Walker, you asked if we clearly teed up that this wasn't approvable regardless. The answer is yes at page 50 to 52 of our opening brief. Actavis acknowledges that at page 45 of its brief and never contests it. The answer why they never contest it is blindingly obvious in this case. FDA told them in 2017, this is a JA 507512 complete response letter, your application is unapprovable at this time. I don't want to go into the details a lot, but one of them was a microbial issue and the other was the missing clinical endpoint study that FDA had required since 2012. The site for that is at JA 385. Then again, Actavis fought very hard not to have to fix those things and it tried to get around them. You can see this through the record documents, which I can give you every one if you want. It suffices to point out to JA 565, which is the 2018 complete approval letter issued shortly after the forfeiture deadline had passed. FDA says it's still unapprovable for the same reasons. It's unapprovable. Then it's years later today and guess what? They still don't have approval because their application is unapprovable. There's no argument at all that this change in requirements had anything to do at all with their failure. From our perspective, those might be reasons you will win straight away when it goes back to the FDA. The counter, at least on what we would do if we agree with your legal test, is to say this is an APA case. The FDA made a legal error, but it has not yet applied the but-for test. We set aside its action and send it back to the agency. I certainly acknowledge that you could do that, Your Honor. Can we do more than that? I think when the record is absolutely clear and there's only one outcome on remand and the issue hasn't been disputed, and I think if you read the briefs carefully, you'll actually see that it hasn't been. You can conclude that there's been a tentative approval. What we don't want to do, again, this is critically important to get this drug on the market and we've been running around in circles now for years. If you just remand, we're going to be back in a black hole for some period of time. I could understand why you would do it that way. You applied the wrong legal standard, but if you do, we would ask that you set a short deadline for FDA to act on remand so that we can move this forward. There's no other questions. I appreciate the Court's time. Thank you. The case is submitted.
judges: Pillard; Walker; Garcia